KOHLER BRICK CO. V. NORTHWESTERN OHIO NATURAL GAS CO.

This was an action against a gas company which put natural gas in a brick kiln. The plaintiff was an employee of the brick company, who, it was claimed, turned on the gas without authority, and was injured by an explosion alleged to have been caused by defects in the regulator, and a failure of the gas company to turn off the gas as it shows: *Held*,

1. JURY TO DETERMINE WHETHER PLAINTIFF WAS AUTHORIZED TO TURN ON GAS.

The jury must determine from the evidence whether the plaintiff was authorized to turn on the gas, taking into account the duties of the workman from whom such authority was claimed.

2. CIRCUMSTANCES WHICH WOULD RELIEVE DEFENDANT FROM LIABILITY.

If the plaintiff turned on the gas without authority from defendant, and any of its officers or agents had been warned not to, or, if it had turned it on, and the plaintiff, before the fire, was notified that it would not be safe, and still continued to use it, defendant is not liable.

3. DEFENDANT NEED ONLY MEET CHARGES IN PETITION.

The defendant is only called upon to meet the charges of negligence named in the petition. There is no allegation that the defendant was required to explain the use of this apparatus, or was not negligent in doing so.

4. JURY MUST DETERMINE AUTHORITY OF DEFENDANT'S WORKMAN.

The jury, in determining the authority of defendant's workman who gave directions as to turning on the gas, should take into account the nature of his work and the duties he had to perform and was there performing.

ERROR to the Circuit Court of Lucas County.

KING, J

This is a proceeding to reverse the judgment of the court of common pleas. The Kohler Brick company brought an action in that court against the Northwestern Natural Gas company, to recover damages

sustained by it by reason of the burning of its works—or some portion of its improvements—in a brick yard. In its petition it alleged that it made an arrangement with the defendant company by which the defendant was to furnish it with gas; and, among other things, that there was upon the premises a regulator-house, in which the defendant company had placed a contrivance known as a regulator; and it alleged that they had on this a gauge, designed to show the pressure of the gas, and an escape valve used for the purpose of allowing gas to escape whenever the pressure became too high; and that it became the duty of the defendant to put in an escape-tube running from the escape-valve out of the regulator-house, for the purpose of carrying out of said house into the open air any escaping gas. Plaintiff alleges that as a duty, and says that on the 18th of August, 1892, the plaintiff having been notified that it could when it pleased, turn on the gas, it did so; and that at that time there was no escape-pipe running from the escape-valve out of the regulator house, and that the plaintiff was ignorant of the necessity for any such tube, but relying upon the statements of the defendant and its agents, had turned on the gas and lighted its fires; that in the performances of his duties, one of its employees went, at one time, to this house carrying a lighted torch, that the gas was so ecscaping as to ignite and cause an explosion, which set fire to the structure and burned it up, and that the fire was caused wholly by the negligence of defendant in constructing its said regulator and appliances, and particularly in not putting on an escape-pipe to carry off the gas. That is the principal item of negligence relied on.

The defendant, in its answer, denied all these allegations of negligence. It further alleged that the plaintiff turned on the gas and lighted its fires without any authority so to do, or any permission from the defendant, and that in so doing it was guilty of negligence; and that also, in the management of it after it was turned on, to-wit: by going into this house with a lighted torch, it was guilty of negligence by which it occasioned the loss of which it complains, and setting up these facts, by the way of a counter-claim, it alleges that they had property there, to the value of $300, which on account of this fire, was destroyed, and it asks a judgment for that amount therefor.

The reply to this denied all the affirmative allegations of the answer; and on this the issue of the case went to trial; considerable evidence was heard, and the jury returned a verdict in favor of the defendant for the amount of its damages, which is found to be a little more than $300; and that is what the plaintiff here seeks to have set aside.

The complaint is made, that the court erred in the course of the trial in the admission of the testimony on behalf of the defendant and in refusing to admit testimony offered by the plaintiff, and in submitting to the jury certain requests asked by the defendant; and also that the verdict and judgment in favor of the defendant is not sustained by the evidence. The allegation in the motion for a new trial, as well as in the petition in error, is, that the verdict is not sustained by the evidence; but no claim is made on argument, that if a verdict had been rendered generally for the defendant, without any assessment of damages in its favor, that it would ask to reverse on the ground that it is not sustained by the evidence; and I might say here, that we are of the opinion that such a verdict would be sustained by the evidence in this case.

The first thing which I will notice is the objections to the testimony;

there are but two or three of them, and the first that I find is on page 84 of the record.

A witness called for defendant, by the name of Joseph Hogan, was asked:

"Q. Do you know of any reason why the valve should be put in there and left open all the time, never closed?"

That was objected to by the plaintiff and overruled, and he stated in answer to that question: "A. It is put there to be used; if it wasn't put there you wouldn't need to use it at all, but it is put there for the purpose of using it." An agent of the plaintiff, Mr. Gorman, had testified that an agent of defendant had said, in describing the operation of these works, that this valve was to be left open all the time, and never was to be closed. Mr. Gorman was inquired of whether he told him that, and he said he never did. Then this question was asked, as to whether there was any necessity for leaving it open all the time, and he was permitted to answer. We think that that was not error; that they had a right to ask him the reason of putting in these valves because he was called as a witness on that very subject; he could describe their use, and what they were for. He not only denied that he had told defendant's agent that that valve was not to be used at all, but testified to its use, or want of use, or necessity of use.

On pages 164 and 165 of the bill of exceptions, plaintiff, in rebuttal, called a witness by the name of John R. Boice, who testifies that he is engaged in the manufacture of brick, and had been for many years, in the city of Toledo; that he still had yards located in this city, and that he ran them in the burning of his brick with natural gas. On page 154, he was asked this question: "Q. During your experience with these regulators since you have used them from the Northwestern Natural Gas company, I will ask you who has turned on or off, what is called the high pressure valve?"

That was objected to and the objection sustained. Another question similar to that, is asked of the same witness on page 165: "Q. I will ask you what has been your custom?" Meaning, with respect to that question. And, on page 173, another witness is called—Frank Blandon —who had something to do with the city natural gas works, and he is inquired of what the custom or rule or regulation was between the city and its customers as to who managed and controlled and turned on and off the gas located on the premises of the consumers. That was objected, to and sustained. There was a dispute among the witnesses as to whether instructions had been given to the defendant company to turn on this gas. It is claimed on the part of the plaintiffs that they were instructed to turn it on whenever they were ready. It was claimed by the defendant company that no such instructions had been given. And there is also evidence tending to show that they were instructed not to turn it on until certain repairs were made. Then it was claimed by defendant that there was a custom which authorized it regardless of instructions, to turn it on. But we do not think that this evidence rises to the dignity of establishing a custom. Mr. Boice was only asked to state what the agreement, rule or arrangement had been with reference to his own yard. As to the city inspector, he was asked to state what the rule was as between the city and its consumers. It is clear that these parties could contract upon this point or subject; and if the gas company authorized the brick company to turn the gas on or off at the regulator it was jus-

tified in so doing; and, if defendant was instructed not to touch it, and it did so, that would be evidence of negligence. We do not think it can be governed by a custom, but by a contract, express or implied—either by express agreement between the parties, or by direction of the authorized agents of the company. The apparatus itself, it is said, belonged to the gas company, which located it there for a certain use. If it had not finished it, if it was not ready for use, certainly the person who was to acquire and use the gas would not have any implied warrant, at least, to open or close these valves until they had been turned over to him; and if they had been turned over to him, then he would have that right.

I come now, before passing upon the requests to charge, to the question of the weight of the evidence. It is claimed that the judgment in favor of the defendant should not be sustained but that it should be set aside. The history of the transaction, briefly stated, is about this: An arrangement was made, in the summer of 1892, to turn gas into these works. They had previously used natural gas, perhaps from some other company—and an arrangement was made with the Northwestern company, and, about the 14th or 15th of August they went there and put a regulator into a small building which had been erected on the premises by the Brick company for that purpose, and had been used for that purpose previously. They worked there on Saturday of one week, and again on Monday, and perhaps Tuesday. The principal workman engaged in putting in the regulator testifies that it was his duty—that that was his employment—to put in the regulator, and that he was there both Saturday and Monday; and it is claimed by the plaintiff that some time before he left there he told the managing agent of the plaintiff company, Mr. Gorman, that the valve was all right, and that they could turn on the gas whenever they got ready to go to work, and that Gorman said they would be ready in a day or two. This Mr. Hogan denies. He testifies that before he finished his work, on the last day he was there, he ascertained by testing the pipes, that there was a leak in the high pressure valve of the regulator in the house; and he also testifies that he went away from the premises of the plaintiff company without saying anything about that leak—that seems to be clear from his testimony. If the case rested there, it would occur to the court that his action in that respect, after he had learned of this defect, in not informing the plaintiff about it, would be such negligence as the defendant would have been responsible for—would be such negligence as contributed to the loss which the defendant company sustained by reason of this fire, so far as to prevent them from recovery of anything on account of it, and that regardless of the question of the amount or degree of the plaintiff's negligence. But this is not all the evidence. This man, as I have said, was charged with the sole duty of putting in these regulators. He had no control whatever, as is proved by the record, over the gas, or of the management of the gas, or the directions as to the use of the gas—how to use it or when to use it, or when it should be turned on, or when it should be turned off. On Thursday, about one or two o'clock, the plaintiff company turned on this gas and burned with it during the afternoon of Thursday. About eight o'clock in the evening one of the employees who was around there at that time, finding that there seemed to be too much gas or too great a pressure, went to the house in which was situated

Kohler Brick Co. v. Northwestern Ohio Natural Gas Co.

the regulator, with a lighted torch, and opened the door to go in, and there was an instant explosion the shock of which was sufficient to throw him backwards and ignite the gas, and spread the fire which destroyed all the property that was destroyed that night. It appears from the record that the Gas company had no knowledge that the gas had been turned on to this kiln before the fire, except that of one of its employees who was there in the afternoon, and of whom I will speak later. Between twelve and one o'clock on Thursday—and whether before or after the gas had been turned into the brick yard it is not clear—Mr. Gorman, who held the position of treasurer for the company, went to the office of the Northwestern Natural Gas company, and, according to the testimony of one witness—Mr. Mack—inquired, as soon as he came in, when they were going to turn the gas on. Mr. Mack was the bookkeeper; but he was temporarily (in the noon hour) in charge of the office. Mr. Mack told him that the gas was not ready to turn on—that there was some defect in the regulator, and that it must not be turned on until that defect was fixed, and that he must not turn it on any way, because nobody had any authority to turn on the gas except Mr. Daly, the superintendent, who was then out of the city, and would not return until that night. To some extent, that conversation is corroborated by L. J. Lewis, who was also present, and who heard it. He was an employee in the office, whose particular duties related to meters. An employee by the name of Hackett—who was a repairer of telegraph wires, came in while they were talking about it, and he corroborates, substantially, that conversation. All three testified that Malone was told that there was a defect in this regulator; that the gas must not be turned on, and that Mr. Daly had the charge of turning it on; and Mr. Malone said, in a laughing sort of a way, that if they did not turn it on he should, and went away; but, before he went away he asked Mr. Hackett, who was the telegraph man, to take a ride with him, and they drove out to the works, and there found that the gas was turned on, and was burning. Hackett says that he was looking at it perhaps an hour, and they were talking about it. He says that they approached the regulator house, and a strong odor of natural gas was plainly discernible, and that he said to Mr. Gorman: "This place smells as bad as a gas field; you fellows better look out." Mr. Gorman made no particular reply, except that while they were there he asked the witness if he would go and look at it and see whether it was all right. Hackett said, "No. I don't know anything about gas. If you ask me some questions about telegraph wires, I can tell you, but I know nothing about gas." After standing there awhile Malone finished his business, and they drove back to the city, and Hackett went with him. That evening between six and seven o'clock, Mr. Malone went up to meet Mr. Daly, who had returned from Sandusky that afternoon. Mr. Daly was the superintendent of the company—and he said to Mr. Daly that there was a very bad leak at the Kohler Brick company's works on South street. Mr. Daly testifies as follows on this subject after saying to Malone: "We will attend to it in the morning."

Q. You may state whether he indicated where the leak was, or in what particular connection it was? A. No, sir. He did not.

Q. When you stated that you would attend to it in the morning, what, if anything, did he say then? A. He said, "All right"

Q.   I will ask you to state whether Mr. Malone said anything to you, and if so what, about the gas having been turned on, and their burning gas?   A.   He said nothing whatever.

Q.   What, if any, information did you have that they were burning gas there at that time?   A.   I had none whatever.

Q.   When did you first learn that the gas had been turned on and that they were using it?   A.   Not until the morning after the fire."

Now, Malone says that he does not remember this talk at the office, all of it.   He says that he went to the office; that he went there to inquire about the meters; that one of them was registering too much, and he inquired about it, and they said they would fix it.   He admits the conversation exactly as given by Mr. Daly, but he says it occurred on Saturday evening.   This Mr. Daly denies, as to Saturday evening, and he produces a diary in which he says he kept a correct record of his movements, and that shows that on Wednesday he went to Sandusky and staid there until Thursday afternoon, and returned here on the train known as No. 5, and that it was on the evening of that day that he had the conversation with Malone at his residence.

In the light of that testimony, we are not prepared to say that this verdict in behalf of the defendant is not sustained by sufficient evidence. If the jury believed these witnesses, then it seems to be clear that Mr. Malone, the treasurer of this corporation, and the man who was interesting himself in the particular business of getting this gas turned on and the manner in which it was working, was told that there was a defect in the regulator; was told that the gas must not be turned on until that regulator was fixed; was told that it must not be turned on until Mr. Daly, the superintendent, gave instructions to do it; and, by his own statement, it appears that he knew and told Mr. Daly himself that there was a defect from which the gas was escaping badly at these works, and that he knew it in ample time to have turned off the gas in the same manner that it had been turned on and could therefore have avoided the injury from the fire.   So, if the jury believed that testimony, they would be warranted in saying that this fire was caused solely by the negligence of the plaintiff, and that in consequence of its negligence this property was destroyed, and the defendant would be entitled to recover its value.

As to the requests to charge, those complained of are two, four, five, six, seven, eight and nine.   They were submitted by the defendant and given by the court, and nearly all of them with qualifications, and the qualifications, so far as I can discern, were unnecessary.   However, we think these charges were proper.

The second request was:   "2. The defendant, in no case, can be held responsible for any use of the gas before they authorized its use, if the appliances were sufficient to prevent injury before such use."   The court said to the jury:   "Gentlemen, that request is given the way it stands; but I will say to you that you must determine, from the evidence in the case, under the instructions of the court, whether the plaintiff, under all the circumstances of the case; was authorized; whether the use of the gas, under the circumstances of the case, was an authorized one or not; whether the plaintiff under all the circumstances of the case, taking into account the duties of the man from whom authority was claimed—if authority was claimed for any one—you must determine from the circumstances of the case, whether in fact the use of the gas was au-

Kohler Brick Co. v. Northwestern Ohio Natural Gas Co.

thorized. Of course, an unauthorized use of the gas on the part of the plaintiff, if, without any authority, any right to use the gas, the plaintiff turned the gas onto its kilns, and, as a result of so doing, the kilns were burned, and they suffered damage, they cannot recover in this action.''

That does not leave very much of the original request.

The fourth and fifth requests are:

4. If the plaintiff turned on the gas without authority from defendant and any of its officers or agents; had been warned not to, or, if it had turned it on, and the plaintiff, before the fire, was notified that it would not be safe, and still continued to use it, defendant is not liable.

5. The defendant in this case is only called upon to meet the charges of negligence named in the petition. There is no allegation that the defendant was required to explain the use of this apparatus, cr was not negligent in not doing so. Nor is there any allegation that the defendant did so in a careless manner; hence there is no question for you to determine in that respect.

And the court say to the jury: ''That is, in respect to negligence on the part of the company in giving instructions, or not giving them to the plaintiff.''

6. The jury would not be justified, from the mere fact that the workman of the defendant put in the regulator, in finding that he had authority to bind the defendant by any directions or statements that the plaintiff might turn on the gas, or that it was ready to turn on- -''

And that was the fore part of the request. The court said: '' The rest of this request I will not read. I will say this, that while from the mere fact as stated in that part of the request read, that 'the workman of defendant put in the regulator,' the jury may not assume that he had authority to bind the defendant by any directions or statements as to the turning on the gas, they may, and should take into account, in determining what his authority was, the nature of his work, the duties he had to perform and was there performing for the defendant. I simply charge that, from the fact alone that he was there for the purpose of putting in the regulator, the jury would not be justified in finding that he was authorized to turn the gas on, or—you might say—that everything was ready to turn the gas on. The nature of his work that he was doing, that he assumed to do, from what has been testified to in the case, must be taken into account, and the jury are informed in reference to these matters; they must determine what his authority was, from the evidence in the case.''

Now, we do not find any error in the charge to the prejudice of the plaintiff.

We therefore affirm this judgment, and certify reasonable cause for the prosecution of the petition in error.

*J. W. Cummings and Kinney & Newton* for Defendant in Error.

*John H. Doyle,* for Plaintiff in Error.